```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION
```

MARCUS ALLEN, M.D.,

    Plaintiff,

v.                                  Case No: 2:18-cv-69-FtM-99MRM

FIRST UNUM LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
CASUALTY INSURANCE COMPANY,
and UNUM GROUP,

    Defendants.

_____

**<u>OPINION AND ORDER</u>**

This matter comes before the Court on defendants' Motion to Dismiss Count III, IV, V, and VII (Doc. #30) and defendants' Motion for Judgment on the Pleadings as to Counts I and II, filed on March 26, 2018. Responses (Docs. ##43, 44) and Replies (Docs. ##53, 54) have been filed. For the reasons set forth below, the Complaint is dismissed as a shotgun pleading with leave to amend.

**I.**

Plaintiff Marcus Allen, M.D. was a practicing diagnostic radiologist who obtained four individual, long-term "own occupation" disability income insurance policies[1] from defendants[2]

---

[1] A large portfolio of defendants' "own occupation" policies is referred to in the Complaint as a "Closed Block." (Doc. #1, ¶ 32.)

[2] Plaintiff alleges that all defendants currently operate under the alter-ego "Unum" and are referred to collectively as "Unum" throughout the Complaint. (Doc. #1, ¶ 19.) Defendants do

in the late 1980s.  Plaintiff specifically chose defendants' policies because they provided for "total disability" if he was unable to perform the duties of his regular occupation ("own occupation") even if he was physically capable of working in another occupation.[3]

In May 2010, Dr. Allen began suffering from changes in his vision which prohibited him from the visual analysis required of a diagnostic radiologist.  Dr. Allen resigned from his radiology practice and filed a claim for disability benefits with defendants in 2010.  Defendants accepted liability on Dr. Allen's claims under all of his policies and paid him monthly benefits of $15,000 for the next five years, until August 31, 2015.

Defendants conducted periodic review of Dr. Allen's disability claim over the years, requesting his medical records and contacting his physicians.  As part of the claim and pursuant to the policies' terms, defendants required plaintiff to apply for Social Security disability benefits.  If he was approved, the

---

not take issue with the grouping of defendants in their dismissal motions.  Therefore, the Court will refer to them collectively as "defendants."

[3] Defendants discontinued the sale of "own occupation" disability plans such as the one purchased by plaintiff in late 1994 because the companies began losing money on the line of coverage. (Doc. #1, ¶¶ 113, 115.)  Thereafter, plaintiff alleges that the companies adopted a practice, pattern, and policy of wrongfully and intentionally denying disability claims filed by "own occupation" policyholders such as plaintiff. (Id., ¶ 116.)

benefit that defendants paid would be reduced by the amount of Social Security benefits. As part of the review process, in 2013, the Social Security Administration (SSA) had plaintiff undergo a physical examination and his medical records and file were reviewed by several physicians and a vocational expert. The SSA determined that Dr. Allen was incapable of performing the occupation of diagnostic radiologist since June 2010, but defendants disagreed with that determination. Therefore, defendants required plaintiff to undergo examinations with its chosen physicians, finding that Dr. Allen failed to support the continued existence of a permanent disability with objective findings. (Doc. #1, ¶ 179.) Defendants terminated Dr. Allen's disability benefits in August 2015 on the ground that he was no longer disabled. Plaintiff has exhausted all appeals with the SSA and defendants. This lawsuit followed.

**II.**

The Complaint alleges that defendants' determination that he was no longer disabled was improper and fraudulent and alleges a billion-dollar fraudulent scheme spanning from 1995 to the present. Plaintiff alleges that defendants sold "own occupation" disability policies to medical specialists without regard to risk of liability and then intentionally, knowingly, and willfully denied benefits under such policies on a fraudulent basis to ensure that the premiums collected for the policies sold exceeded the claims paid under the policies. Plaintiff alleges that he is a

victim of this fraudulent scheme. Plaintiff believes that the practical application of the scheme is that an "own occupation" policy for a medical specialist is essentially worthless in protecting disability in that specialty because any claim will be denied. Based on these allegations, Dr. Allen presents eight counts:

- Breach of Contract (Count I)
- Breach of Fiduciary Duty (Count II)
- RICO, 18 U.S.C. § 1962(a) (Count III)[4]
- RICO, 18 U.S.C. § 1962(b) (Count IV)
- RICO, 18 U.S.C. § 1962(c) (Count V)
- Fraud as to Statements and Omissions Regarding Nature and Quality of Policy (Count VI)
- Fraud as to Claims Determinations (Count VII)
- Violations of ERISA (Count VIII)

Plaintiff seeks:

- Recovery for disability benefits wrongfully withheld by Defendants plus interest;
- Reimbursement plus interest for all premiums paid by Plaintiff while disabled under the policies;
- Reimbursement of attorney's fees incurred in pursuit of this claim plus interest;
- Punitive damages; and

---

[4] The RICO predicate acts alleged are mail and wire fraud.

- To expose evidence, prove and appropriately sanction Defendants under the Federal RICO statutes for its implementation of a "Scheme," described more completely in the next section, by which Unum and Defendants planned and implemented fraudulent claims handling practices across the globe, resulting in the improper denial or termination of disability claims for the purpose of improving its reserve position, operating results and, ultimately, the price of its publicly held stock.

(Doc. #1, ¶ 28.)

As alleged in the Complaint, this is not the first lawsuit filed against defendants for the same conduct plaintiff alleges to have occurred here. Many similarly-situated physicians before Dr. Allen have challenged the same scheme alleged in the Complaint to have been perpetrated against Dr. Allen in both state and federal court, some filed in this Court. See Doc. #1, ¶¶ 32, 66, 69, 73, 82, 190, 257, 279; Hepp v. The Paul Revere Life Ins. Co., No. 8:13-cv-2836-EAK-TAB (M.D. Fla. 2013); Natarajan v. Unum Life Ins. Co. of Am., No. 8:04-cv-2612-T-17TGW (M.D. Fla. 2004).

Defendants believe that the case presents a straightforward ERISA dispute over whether plaintiff is entitled to disability benefits and they argue that plaintiff is attempting to improperly expand this lawsuit by asserting numerous claims that fail to state a cause of action. Defendants filed a Motion to Dismiss Counts III-VII, arguing that the Complaint is an impermissible shotgun pleading that violates Rule 8's requirement that a complaint include a "short and plain statement of the claim[s]", as well as

other substantive argument for failure to state a claim. Defendants filed an Answer to Counts I, II, and VIII (Doc. #47), and move for judgment on the pleadings as to Counts I and II (Doc. #32), arguing that Counts I and II are state law claims that are preempted by ERISA.  Defendants ask that the Court confine this case to the ERISA count only.

**III.**

Shotgun pleadings violate Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), by "fail[ing] to one degree or another ... to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." <u>Weiland v. Palm Beach Cnty. Sheriff's Ofc.</u>, 792 F.3d 1313, 1323 (11th Cir. 2015) (defining the four types of shotgun pleadings).[5]  Courts in

---

[5] The four "rough" types or categories of shotgun pleadings identified by the Eleventh Circuit in <u>Weiland</u> are:

> The most common type — by a long shot — is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.  The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief.  Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple

the Eleventh Circuit have little tolerance for shotgun pleadings. See generally Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 979-80, n.54 (11th Cir. 2008) (collecting numerous cases), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). They waste scarce judicial resources, "inexorably broaden[ ] the scope of discovery," "wreak havoc on appellate court dockets," and "undermine[ ] the public's respect for the courts." Id. at 981-83 (detailing the "unacceptable consequences of shotgun pleading"). A district court has the "inherent authority to control its docket and ensure the prompt resolution of lawsuits," which includes the ability to dismiss a complaint on shotgun pleading grounds. Weiland, 792 F.3d at 1320. In a case where a defendant files a shotgun pleading, a court "should strike the [pleading] and instruct counsel to replead the case – if counsel could in good faith make the representations required by Fed. R. Civ. P. 11(b)." Byrne v. Nezhat, 261 F.3d 1075, 1133 n.113 (quoting Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997)).

In addition, in civil cases, "RICO plaintiffs must satisfy the requirements of 18 U.S.C. § 1964(c)," i.e., they "must show (1) the requisite injury to 'business or property,' and (2) that

---

        defendants without specifying which of the defendants
        are responsible for which acts or omissions, or which of
        the defendants the claim is brought against.

Weiland, 792 F.3d at 1322-23.

such injury was 'by reason of' the substantive RICO violation." Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282–83 (11th Cir. 2006) (per curiam) abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714–15 (11th Cir. 2014). "[C]ourts should scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations." Id. at 1287 (citing Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006)). Although plaintiffs are not required "to show that the injurious conduct is the sole cause of the injury asserted, ... there must be 'some direct relation' between the injury alleged and the injurious conduct in order to show proximate cause." Id. at 1287–88 (citing Anza, 547 U.S. at 457). "[I]t is enough for the plaintiff to plead and prove that the defendant's tortious or injurious conduct was a 'substantial factor in the sequence of responsible causation.'" Id. at 1288 n.5.

In accordance with Rule 9(b), "[w]hen a RICO claim is based on predicate acts involving fraud, those predicate acts must be pleaded with particularity[.]" Liquidation Comm'n of Banco Intercontinental S.A. v. Renta, 530 F.3d 1339, 1355 (11th Cir. 2008) (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316–17 (11th Cir.2007)); see also Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010).

**IV.**

In this case, the Complaint spans 77 pages and 392 paragraphs, with 95 pages of exhibits, alleging breach of contract, breach of fiduciary duty, fraud, violations of the RICO statute, and ERISA. Many of the paragraphs unnecessarily repeat throughout the Complaint, contributing to its unnecessary expanse. The Complaint also contains inconsistent allegations and incorporates by reference irrelevant factual allegations. It is also unclear whether numerous allegations are even relevant to *this plaintiff's* injuries, yet these allegations take up pages and pages, burying the material allegations. The Court has culled through the entirety of the Complaint to provide plaintiff with specific examples of the deficiencies. See Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018) (noting that in striking a complaint on shotgun pleading grounds and affording the plaintiff an opportunity amend, the district court should point out the defects in the complaint so that the party may properly avoid future shotgun pleadings).

Before the "Counts" section, the Complaint contains 192 paragraphs divided into the following sections: "Jurisdiction", "Venue", "the Parties", "Overview of the Action", "the Scheme", "the Individual Insurance Policies", "the Disability Plan", "the Disability", and "the Claims Process." All Counts incorporate these 192 paragraphs by reference except for the breach of

fiduciary duty count which incorporates by reference all paragraphs from the breach of contract count as well (making that <u>208 paragraphs</u> that are incorporated into the breach of fiduciary duty count). (Doc. #1, ¶¶ 193, 209, 225, 247, 269, 291, 307, 321.) The Court also notes that Count II includes five paragraphs of quotes and citations to case law (mostly from other states). (<u>Id.</u>, ¶¶ 211-15.) This is unnecessary and should not be included in the Amended Complaint.

The following sets of paragraphs contain duplicate allegations, sometimes word-for-word:

11, 143

53, 131

55, 132

57, 132

58, 232, 254, 276

67(S), 123

116, 217

135, 298

136, 299

137, 300-01

138, 302[6]

176, 318

---

[6] The allegations in these paragraphs are also inconsistent as discussed below.

179, 186, 230, 252, 274

180, 308

184, 231, 253, 275

187, 229, 251, 273

189, 234, 256, 257, 278, 279

Furthermore, the allegations under the ERISA count are largely a repeat of paragraphs 158-92 (the "Claims Process" section). The duplication of allegations contained in paragraphs 1-192 within any count is unnecessary as plaintiff incorporated paragraphs 1-192 by reference into each count. The Court has only listed a handful of examples, but the list of duplication is not exhaustive. Plaintiff should make every effort to succinctly state the alleged conduct that caused plaintiff's injuries.

Regarding inconsistent allegations, plaintiff alleges at paragraph 301 that "in the years after Plaintiff's purchase of the Policies, Provident did not charge Plaintiff a premium, despite Unum's change in internal policy and marked alteration of the lack of intent to honor the Policies, and the relative worthlessness of the Policies due to such change." (Doc. #1, ¶ 301.) Based upon the other allegations in the Complaint it appears this should read that Provident did not charge plaintiff a lower premium or change his premium, but it is not entirely clear. Furthermore, at paragraph 138 and 302, plaintiff makes the same allegation but changes the year from 1994 to 1995.

Furthermore, numerous actions of defendants do not seem to be connected to any losses allegedly suffered by plaintiff such that the Court could plausibly infer that the denial of plaintiff's claim (which was initially paid for five years) directly resulted from a pattern of racketeering activity dating back to 1995. For example, plaintiff alleges that in 1995 the scheme started and defendants "instituted an intensive joint claims/legal special review process to target and terminate high end claims." (Doc. #1, ¶ 118.) Plaintiff then alleges that defendants began to lose money on its "own occupation Closed Block" policies in 2011 and 2012 and "devised and implemented a business plan to re-engineer the Closed Block into a profitability machine." (Id., ¶ 132.) Plaintiff's claim for benefits was denied in 2015, so it is unclear whether defendants' conduct regarding the "own occupation" policies prior to 2011 before the companies implemented a new business plan would apply to plaintiff. In other words, did the scheme that affected plaintiff begin in 1995 or 2011 because as pled it sounds as if the conduct as to each time period was different. This should be clarified in the Amended Complaint.

The Complaint also contains numerous allegations that reference litigation tactics and findings by courts in other cases similar to plaintiff's. The Court fails to see how these allegations tie into plaintiff's case and the harm he allegedly suffered, and plaintiff makes no plausible allegation to support

such a connection. See Weiland, 792 F.3d at 1321–22 (a shotgun pleading is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"). Some examples follow:

> Using hard-ball litigation tactics and threats of counterclaims known to be frivolous as a weapon to promote unreasonable buy outs of claims. (Doc. #1, ¶ 67(K).)
>
> Engaging in a systematic and improper classification of data and evidence as privileged attorney client communication or attorney work product in order to preclude or attempt to preclude discovery, especially in the event of litigation, thereby affecting the denial, termination or onerous settlement of legitimate claims. (Id., ¶ 67(O).)
>
> Engaging in a systematic and improper abuse of the civil process by improperly directing and rewarding employee attorneys and retained attorneys so as to interfere with and promote the violation of their professional obligations in order to effect [*sic*] the denial, termination or onerous settlement of legitimate claims. (Id., ¶ 67(P).)
>
> Promoting and directing the compilation of incomplete and deceptive files in anticipation of litigation, knowing that those incomplete and deceptive files would be offered as evidence in various courts. (Id., ¶ 67(Q).)
>
> Upon information and belief, Unum tampered with the potential testimony and information to be supplied to their employees and otherwise perverted and obstructed justice to achieve its own financial goals. (Id., ¶ 67(Z).)
>
> Thousands more of these types of lawsuits exist throughout the country, but Unum hopes to hide from public view its multiple legal abuses in closed and open claims and lawsuits by coordinating with outside counsel in yearly seminars to institute a pattern and practice of demanding and securing confidentiality agreements

> from claimants burdened and exhausted by extensive, expensive litigation. (Id., ¶ 74.)
>
> This Outside Guide to Counsel has been held to be in violation of local rules of practice and Federal Rule of Civil Procedure because it 'hamstrings the lawyer charged with defending the claim,' and it 'seems to be based upon the erroneous presumption that litigation is like chess, the object is to win by anticipating the opponent's moves to the point that the opponent has not place to turn and must then concede.' Frederick v. Unum Life Ins. Co., 180 F.R.D. 384 (D. Mont. Missoula Div. 1998). The Court in Frederick also stated that 'litigation is not a game in which counsel are paid only where they advance the ball.' (Id., ¶ 76.)

This goes on. See Doc. #1, ¶¶ 77-80, 82.

Plaintiff also states that the scheme was exposed on NBC's Dateline and CBS's 60 Minutes in 2002 and was detailed in an "extraordinary" footnote 20 in a District of Massachusetts case, listing 33 federal cases across the country which have found Unum's claims handling reprehensible. (Doc. #1, ¶ 69.) Plaintiff alleges that defendants' practices have drawn the attention of the New York Attorney General and the U.S. Department of Labor, and that juries have awarded plaintiffs millions in cases such as plaintiffs. (Id., ¶¶ 72, 73.) The only effort plaintiff makes to relate these prior cases and litigation conduct to plaintiff is the conclusory statement "upon information and belief" that "plaintiff's benefit claims terminations were part of Unum's deliberate and continuing pattern of erroneous and arbitrary benefits denials, bad faith misrepresentations, and other unscrupulous tactics." (Id., ¶ 83.) This allegation as to

plaintiff is vague and conclusory and does not connect the general allegations of prior litigation conduct to the denial of plaintiff's claim. "Thus, we have previously held that plaintiffs did not adequately plead a RICO claim where their complaint asserted only the bald conclusion that the plaintiffs relied on a misrepresentation without showing how that reliance was manifested." Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1349 (11th Cir. 2016) (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1317 & n.12 (11th Cir. 2007)). There must be "some direct relation between the conduct and the injury to sustain a claim." Id. These are just a few examples of the paragraphs that fail to link the conduct alleged therein to plaintiff's loss.

Moreover, it is particularly difficult to understand how the details of the fraudulent scheme are relevant to plaintiff's ERISA claim (Count VIII), yet the allegations of the scheme (paragraphs 1-192) are incorporated into Count VIII.

The Court will dismiss the Complaint with leave to amend. The Court will otherwise deny the Motion to Dismiss, with leave to refile a similar motion, if appropriate, after an Amended Complaint is filed. Failure to address the deficiencies identified in this Opinion and Order could result in the case being dismissed with prejudice. See Jackson v. Bank of America, N.A., --- F.3d ---, 2018 WL 3673002, *6-7 (11th Cir. Aug. 3, 2018).

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Defendants' Motion to Dismiss Count III, IV, V, and VII (Doc. #30) is **GRANTED** to the extent that the Complaint (Doc. #1) is dismissed as a shotgun pleading without prejudice to filing an Amended Complaint in accordance with this Opinion and Order within **FOURTEEN (14) DAYS.**

2. Defendants' Motion for Judgment on the Pleadings as to Counts I and II (Doc. #32) is **DENIED as moot.**

**DONE and ORDERED** at Fort Myers, Florida, this __8th__ day of August, 2018.

/s/ John E. Steele
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record