UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARCUS ALLEN, M.D.,

              Plaintiff,

v.                       Case No.: 2:18-cv-00069-JES-MRM

FIRST UNUM LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
CASUALTY INSURANCE COMPANY
and THE UNUM GROUP,

              Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on review of the parties' cross Motions for Summary Judgment on Counts 1 and 2 of the Second Amended Complaint (Docs. ##145, 148). Responses in Opposition (Docs. ##154, 155) were filed, as were Replies (Docs. ##159, 160). In addition, Plaintiff filed a Motion for Summary Judgment on Defendants' First, Fourth, and Fifth Affirmative Defenses (Doc. #149), to which Defendants filed a Response in Opposition (Doc. #153) and Plaintiff filed a Reply (Doc. #161).

For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's cross-motion for summary judgment is denied, but his motion for summary judgment on Defendants' affirmative defenses is granted in part and denied in part.

**I.**

This case involves a dispute concerning five disability income insurance policies covering Dr. Marcus Allen (Plaintiff or Dr. Allen) issued by Provident Life and Casualty Insurance Company (Provident) or First Unum Life Insurance Company (First Unum) and The Unum Group (Unum Group). Four of the policies are individual disability insurance policies (the Individual Policies), while the fifth policy is a group disability insurance policy (the Group Policy), (collectively the Policies). (Doc. #87, ¶¶ 17-45.)

The operative pleading is the Second Amended Complaint (SAC) (Doc. #87), and the only remaining claims are two counts of breach of contract (Counts 1, 2). In Count 1 of the SAC, Plaintiff asserts a state law claim of breach of contract against defendants Provident and Unum Group, alleging he has been and remains totally disabled and is owed unpaid benefits under the four Individual Policies. (Id., p. 29.) Count 2 of the SAC alleges a state law breach of contract claim against defendants First Unum and The Unum Group, claiming that Plaintiff's benefits under the Group Policy were wrongfully terminated. (Id., p. 32.)

Defendants argue they are entitled to summary judgment as to Counts 1 and 2 because the undisputed material facts show Plaintiff's claims are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA), and First Unum's decision to terminate Plaintiff's disability benefits under

2

the Group Policy was not arbitrary or capricious.  (Doc. #145, p. 2.)  Plaintiff, on the other hand, argues that none of the Policies are governed by ERISA, and he is entitled to summary judgment on both his state-law claims because Defendants have provided no evidence to suggest he is no longer disabled or was no longer disabled when his disability benefits were terminated. (Doc. #148, pp. 1-2.) Additionally, Plaintiff asserts that he is entitled to summary judgment with respect to Defendants' First, Fourth, and Fifth Affirmative Defenses because as a matter of law the Policies are not governed by ERISA. (Doc. #149, p. 3.)

**II.**

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999)(quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983)(finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts.")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

Cross motions for summary judgment do not change the standard. See Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant

of another.  See id.  Even where the parties file cross motions
pursuant to Rule 56, summary judgment is inappropriate if disputes
remain as to material facts.  United States v. Oakley, 744 F.2d
1553, 1555 (11th Cir. 1984).

**III.**

As relevant to the current motions, the undisputed material
facts are as follows:

Dr. Allen became a board-certified radiologist in 1984.  In
March 1986, Dr. Allen began working as a diagnostic radiologist at
Prospect Hill Radiology Group, P.C. (Prospect Hill) in Syracuse,
New York.  While working at Prospect Hill, Dr. Allen purchased
four individual, long-term disability income insurance policies
from Provident through its agent David Schultz in Syracuse, New
York.[1] (Doc. #87, ¶¶ 7, 17, 21-24; Docs. ##87-1; 87-2; 87-3; 87-
4.)  Dr. Allen personally paid all premiums due on the Individual
Policies. (Doc. 43-1, ¶ 35-38.)

Effective June 1, 2005, defendant First Unum issued a Group
Policy to Prospect Hill which provided long term disability
insurance coverage to the "Partners" of Prospect Hill.  (Doc. #87,

---

[1] The Individual Polices are identified as: (1) Policy 1 –
Policy #36-334-60188, issued March 13, 1986; (2) Policy 2 — Policy
#36-334-60526, issued March 13, 1986; (3) Policy 3, Policy #36-
335-66237, issued May 5, 1987; and (4) Policy 4 – Policy #36-335-
6002485, issued February 17, 1989. (Docs. ##87-1; 87-2; 87-3; 87-
4.)

¶ 38; Doc. #87-5, p. 3.) Prospect Hill paid all premiums on the Group Policy. (Doc. #43-1, ¶¶ 41-43.)

In May 2010, Dr. Allen experienced a "sudden change" in his vision that affected his ability to conduct the acute visual analysis required of a diagnostic radiologist. (Doc. #87, ¶¶ 47-49.) After he was examined by three physicians, Dr. Allen was diagnosed with "ocular degeneration, posterior vitreous detachment with retinal tear, bleed in his left eye, as well as significant floaters and visual disturbances in both eyes detrimentally impacting his visual field." (Id. at ¶¶ 50-51; Doc. #147-1, p. 350.) Dr. Allen resigned from his radiology practice on June 23, 2010, and filed a claim for disability benefits with Defendants, asserting that he became totally disabled as of May 1, 2010. (Doc. #87, ¶¶ 51-55.) At the time, Dr. Allen was fifty-six years old.

After reviewing Dr. Allen's documentation in support of disability, Defendants determined he was totally disabled under the Policies. (Id. at ¶¶ 56-57.) On or about January 15, 2011, Defendants began paying Dr. Allen 60% of his monthly earnings up to the "Maximum Monthly Amount" of $15,000. (Id. at ¶¶ 42, 59; Doc. #147-1, pp. 478-83.)

While paying disability benefits, Defendants requested Dr. Allen's medical records as part of periodic medical reviews. These medical records revealed that Dr. Allen suffered from floaters and

glare that impacted his vision and ability to read x-rays. (Doc. #87, ¶¶ 70-71.)

Dr. Allen was also required by Unum to apply for Social Security disability benefits, and did so on June 13, 2011. (Doc. #87, ¶ 72; Doc. #147-9, p. 296.) In 2013, the Social Security Administration (SSA) required Plaintiff to undergo a physical examination, and his medical records and file were reviewed by several physicians and a vocational expert. (Doc. #87, ¶ 76.) On June 28, 2013, the SSA determined that Dr. Allen had a "severe impairment" and was incapable of performing the occupation of diagnostic radiologist since June 2010, but that he could "engage in any other kind of substantial gainful work . . . ." (Doc. #87, ¶¶ 77, 101; Doc. #147-9, pp. 299-303.) In November 2013, Dr. Allen moved to Naples, Florida. (Doc. #148-1. P. 7.)

Defendants also required Dr. Allen to undergo additional Independent Medical Examinations (IMEs) with two physicians of their choosing. (Doc. #87, ¶¶ 105-06.) The IMEs found evidence of floaters and visual disturbances in Dr. Allen's eyes that impacted his field of vision. Defendants determined, however, that there was no objective medical evidence to support the continued existence of disability. (Id. at ¶¶ 107-08, 110, 114.)

On August 31 and September 1, 2015, after paying disability benefits for approximately five years, Defendants terminated Dr. Allen's disability benefits under his Individual and Group

Policies. (Id. at ¶¶ 113, 134.) Dr. Allen appealed the benefit termination decision through Defendants' internal appeal process. On February 24, 2016, Defendants upheld the decision to terminate Plaintiff's benefits under all the Policies. (Id. at ¶¶ 120-21.)

Additional facts will be discussed as necessary to resolve specific issues.

## IV.

The crux of Defendants' summary judgment motion is that the state-law breach of contract claims in both Counts 1 and 2 are defensively preempted by ERISA. (Doc. #145, pp. 15-22; Doc. #69, pp. 14-16.)  Dr. Allen responds that ERISA does not govern either the Individual Policies or the Group Policy.  (Doc. #155, pp. 17-23.)  The Court concludes that each side is half right.

### A. ERISA Defensive Preemption Principles

In an earlier Opinion and Order in this case, the Court noted that

> under ERISA, two types of preemption may arise—conflict preemption or complete preemption. Here, defendants rely on conflict preemption. "Conflict preemption, also known as defensive preemption, is a substantive defense to preempted state law claims." Conn. State Dental. Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1344 (11th Cir. 2009). "This type of preemption arises from ERISA's express preemption provision, § 514(a), which preempts any state law claim that 'relates to' an ERISA plan." Id. (citing 29 U.S.C. § 1144(a) (ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described

in section 1003(a) of this title and are not
exempt under section 1003(b) of this
title.")).

(Doc. #86, pp. 6-7.) A state law claim is defensively preempted
pursuant to 29 U.S.C. § 1144(a) if plaintiff's state law claim (1)
"relate[s] to" (2) an employee benefit plan governed by ERISA.
Garren v. John Hancock Mut. Life Ins. Co., 114 F.3d 186, 187 (11th
Cir. 1997).

**(1) "Relates to"**

Several phrases have been used to describe the "relates to"
requirement. "[A] party's state law claim 'relates to' an ERISA
benefit plan for purposes of ERISA preemption whenever the alleged
conduct is intertwined with the refusal to pay benefits." Garren
114 F.3d at 187. "State law claims that 'have a connection with
[an] ERISA plan' are thus preempted." Engelhardt v. Paul Revere
Life Ins. Co., 139 F.3d 1346, 1351 (11th Cir. 1998), quoting
Morstein v. Nat'l Ins. Serv. Inc., 93 F.3d 715, 722 (11th Cir.
1996) (en banc). "A state law 'relates to' a covered employee
benefit plan 'if it has a connection with or reference to such a
plan.'" Variety Children's Hosp., Inc. v. Century Med. Health
Plan, Inc., 57 F.3d 1040, 1042 (11th Cir. 1995), quoting District
of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 129
(1992). See also Hall v. Blue Cross/Blue Shield of Ala., 134 F.3d
1063, 1065 (11th Cir. 1998). There does not appear to be any
substantive differences in the different formulations.

**(2)  Employee Benefit Plan Governed by ERISA**

The second requirement for defensive preemption is the existence of an ERISA-governed plan.  The rule is deceptively simple to state: "ERISA governs employee welfare benefit programs provided by an employer. See 29 U.S.C. § 1001 et seq." Moorman v. UnumProvident Corp., 464 F.3d 1260, 1265 (11th Cir. 2006).  The parties dispute whether the facts in this case establish such an ERISA-governed employer program.

Generally, a "plan" under ERISA is "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).  An "employee welfare benefit plan" is in turn defined in relevant part as

> []any plan, fund, or program which was . . .
> established or maintained by an employer . .
> . to the extent that such plan, fund, or
> program was established or is maintained for
> the purpose of providing for its participants
> or their beneficiaries, through the purchase
> of insurance or otherwise, (A) . . . benefits
> in the event of . . .  disability, . . . .

29 U.S.C. § 1002(1).  Thus, as relevant to this case, a welfare benefit plan requires (1) a "plan, fund, or program" (2) established or maintained (3) by an employer, (4) for the purpose of providing disability benefits, (5) to participants or their beneficiaries.  Donovan v. Dillingham, 688 F.2d 1367, 1370 (11th Cir. 1982) (en banc); Anderson v. Unum Provident Corp., 369 F.3d

1257, 1263 (11th Cir. 2004); Garcon v. United Mut. of Omaha Ins. Co., 779 F. App'x 595, 597 (11th Cir. 2019).[2]  Determining whether an insurance policy is an "employee welfare benefit plan" governed by ERISA is a question of law for the court after considering all surrounding circumstances and facts from the point of view of a reasonable person. Stern v. IBM, 326 F.3d 1367, 1373 (11th Cir. 2003) (citing Donovan, 688 F.2d at 1373).

"A plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit." Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1214 (11th Cir. 1999) (citing Donovan, 688 F.2d at 1373). "[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program . . .." Donovan, 688 F.2d at 1373. The Eleventh Circuit has identified seven factors which may be relevant in determining whether an employee welfare benefits plan has been established: "(1) the employer's representations in internally distributed documents; (2) the employer's oral representations; (3) the employer's establishment of a fund to pay benefits; (4) actual payment of benefits; (5) the employer's deliberate failure

---

[2] The parties dispute whether ERISA should be interpreted in this case under Second Circuit or Eleventh Circuit precedent.  The dispute is illusory as to this portion of the case since the Second Circuit follows the Eleventh Circuit's Donovan v. Dillingham decision, having found that its "logic is persuasive."  Guilbert v. Gardner, 480 F.3d 140, 146 (2d Cir. 2007).

to correct known perceptions of a plan's existence; (6) the reasonable understanding of employees; and (7) the employer's intent." Butero, 174 F.3d at 1215; Anderson, 369 F.3d at 1265-66.

To "maintain" a plan simply means to "continue" a plan. Anderson, 369 F.3d at 1265. The seven Butero factors are also important in determining whether a plan has been maintained. Moorman, 464 F.3d at 1269.

The focus of the inquiry is the conduct of the employer or employee organization. It is "an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, [which] must establish or maintain the plan, fund, or program." Donovan, 688 F.2d at 1373. "Our inquiry thus necessarily focuses on 'the employer ... and [its] involvement with the administration of the plan,'" Moorman, 464 F.3d at 1269, quoting Anderson, 369 F.3d at 1263, not the conduct of others. "[W[hether a plan is 'established' is determined by the *employer's* conduct, not that of any other ERISA entity." Butero, 174 F.3d at 1214 (emphasis in original).

## B. Application of Defensive Preemption Principles to Plaintiff's Individual Policies

### (1)  "Relates to" Requirement

There is no question that Plaintiff's state-law breach of contract claim in Count 1 "relates to" Dr. Allen's Individual Policies.  The alleged conduct is not only intertwined with the

failure to pay benefits, but the failure to pay disability benefits is the crux of the breach of contract claim.  See Swerhun v. Guardian Life Ins. Co. of Am., 979 F.2d 195, 198 (11th Cir. 1992)("We have consistently held that ERISA preempts state law breach of contract claims."); Butero, 174 F.3d at 1215 (finding it well-settled that breach of contract claims are the types of claims preempted under ERISA).

    **(2)   ERISA-Governed Employee Benefit Plan**

The dispositive defensive preemption issue as to Count 1 is whether the Individual Policies constituted an employer's ERISA plan.  Defendants assert that Dr. Allen's Individual Policies qualify as part of an "employee benefit plan" because they were established or maintained by Prospect Hill, Dr. Allen's employer. (Doc. #145, pp. 18-20.) Dr. Allen responds that Prospect Hill neither established nor maintained the Individual Policies and had no involvement with the Individual Policies.  (Doc. #155, pp. 17-18.)  Dr. Allen also asserts that the Individual Policies fall within the "safe harbor" exception of ERISA (Doc. #149, p. 14) and that the Individual Policies were exempt from ERISA coverage because he was a "shareholder/partner/owner" of Prospect Hill and not an employee. (Id. at 15.)

The Court rejects Dr. Allen's argument that the Individual Policies are exempt from ERISA because he was a "shareholder/partner/owner" of Prospect Hill.   Under the

undisputed facts set forth in the record, Dr. Allen's status as a shareholder or partner of Prospect Hill does not preclude a plan from being governed by ERISA or Dr. Allen from being a beneficiary of an ERISA plan.  See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 1 (2004); Gilbert v. Alta Health & Life Ins. Co., 276 F.3d 1292, 1302 (11th Cir. 2001); Engelhardt v. Paul Revere Life Ins. Co., 139 F.3d 1346, 1351 (11th Cir. 1998).

The Court also rejects Dr. Allen's argument that his Individual Policies cannot be defensively preempted because they fall within the "safe harbor" exception of ERISA.  "The United States Department of Labor explicitly exempts from ERISA governance certain 'group or group-type insurance programs offered by an insurer to employees.' 29 C.F.R. § 2510.3-1(j)."  Moorman, 464 F.3d at 1265.  The Individual Policies are not a "group or group-type" insurance program, so the safe harbor exemption cannot apply.  This does not end the inquiry, however, because even "a plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA.".  Moorman, 464 F.3d at 1269 (citation omitted.)

In is undisputed that: (1) Dr. Allen personally purchased all four Individual Policies through Provident agent David Schultz;[3]

---

[3] Dr. Allen first met with Provident agent David Schultz in 1982 when he was employed as a medical resident at Upstate Medical Center. (Doc. #149-1, ¶ 8.) Dr. Allen agreed to purchase Policies 1 and 2 from Agent Schultz while he was still employed by Upstate

(2) Dr. Allen or his wife personally paid all the premiums for all the policies for all the years the Individual Policies were in force;[4] (3) No premiums for the Individual Policies were deducted from Dr. Allen's income by Prospect Hill;[5] (4) Prospect Hill never itself paid any premiums for the Individual Policies;[6] and (5) Prospect Hill had no involvement in the selection, purchase, or continuation of the Individual Policies.[7]

---

Medical Center, but these policies were not issued until after Dr. Allen began employment at Prospect Hill. (Id. at ¶¶ 4-6.)  The Court rejects Dr. Allen's argument that Policy 1 and Policy 2 cannot be part of Prospect Hill's ERISA plan because his application was made while he was still employed at Upstate Medical Center.  (Doc. #149, p. 15.)  The Application Progress Sheet created by Defendants, Exhibit K to Defendants' submissions (Doc. #147-24), states that Dr. Allen's policy was in connection with the Upstate Medical Center plan.  But what matters is when the policy became a contract, not when an application was filed.

[4] Dr. Allen has stated without contradiction that he and/or his wife personally paid the premiums to either Agent Schultz or Provident. (Doc. #149-1, ¶¶ 2-17, 23, 25, 35-37, pp. 126-35.)

[5] See infra note 6.

[6] Prospect Hill's bookkeeper stated that the company never paid for plaintiff's Individual Polices, and that despite overseeing the companies' finances, she knew nothing about the Policies. In particular, a February 9, 2011 letter from the bookkepper to Unum confirmed that with respect to Dr. Allen's Individual Policies, "RE: Policy numbers 60188, 606526, 66237 & 6002485 Provident Life and Casualty Insurance Company, the company [Prospect Hill] does not pay for these policies and I would assume that the individual paid for them on his own, as I have no knowledge of them." (Doc. #149-1, p. 136.)

[7] In addition to the bookkeeper's testimony, Dr. Allen stated that in 1986, when he first began working for Prospect Hill, disability insurance was not part of his compensation package, and Prospect Hill never publicized or offered him individual

Nonetheless, Defendants assert that the following facts establish that the Individual Policies purchased by Dr. Allen constitute a ERISA plan by Prospect Hill: (1) Prospect Hill entered into a 1976 "Salary Allotment Agreement" with Provident; (2) each of the Individual Policies has a Salary Allotment rider which references a Salary Allotment Agreement; (3) the premiums for Dr. Allen and other Prospect Hill employees were group-billed by Provident under a common "risk number"; and (4) Dr. Allen and other Prospect Hill employees paid discounted premiums pursuant to their group membership. (Doc. #145, p. 18.)  The Court discusses each in turn.

### (a)   Salary Allotment Agreement

The New York Department of State website states that Prospect Hill Radiology Group, P.C. is an active domestic professional corporation. (Doc. #147-17.)  Under "name history," the website document shows that on August 9, 1971 the entity name was "Carsky, Brownell, Berrigan & Shaheen, M.D., P.C.;" on July 15, 1976, the entity name was "St. Joseph's Radiology Group, P.C."; and finally on November 17, 1978, the entity name became "Prospect Hill

---

disability income coverages or communicated the existence of any agreement that would provide a discount insurance premium rate. Dr. Allen states that he elected on his own (and with no participation from Prospect Hill) to purchase his Individual Policies. (Doc. #149-1, ¶¶ 2-17, 23, 25, 35-37, pp. 126-35.)

Radiology Group, P.C." (Doc. #147-17, pp. 2-3.) For summary judgment purposes, the Court accepts the accuracy of the factual assertions that Prospect Hill is an active domestic professional corporation and that a prior name of the entity which is now Prospect Hill was "Carsky, Brownell, Berrigan & Shaheen, M.D., P.C."[8]

Defendants claim that on May 5, 1976, Prospect Hill's predecessor-entity-twice-removed, "Carsky, Brownell, Berrigan & Shaheen, M.D., P.C.," entered into a Salary Allotment Agreement (the Agreement) with the Provident Life and Casualty Insurance Company of Chattanooga, Tennessee. (Doc. #147-16, p. 2.) The one—

---

[8]"This Court has discretion to take judicial notice of material derived from official government web sites such as those generated by the New York State Department of State." LaSonde v. Seabrook, 89 A.D.3d 132, 137, 933 N.Y.S.2d 195, 199 (2011)(citation omitted); see also Swindol v. Aurora Flight Scis. Corp., 805 F.3d 516, 519 (5th Cir. 2015) ("We conclude that the accuracy of these public records contained on the Mississippi Secretary of State's and the Virginia State Corporation Commission's websites cannot reasonably be questioned."). The Court grants the part of Defendants' request to take judicial notice of the New York Department of State website as to Prospect Hill being an active entity and its name history. (Doc. #145, p. 4 n.1.) The Court declines to take judicial notice that "Carsky, Brownell, Berrigan & Shaheen, M.D., P.C." is "the name under which Prospect Hill entered into the Salary Allotment Agreement" as requested at Doc. #145, p. 4 n.1. This statement is one which can reasonably be questioned, and therefore does not fall within the scope of Fed. R. Evid. 201(b)(2). The website carries the following disclaimer: "As the Department relies upon information provided to it, the information's completeness or accuracy cannot be guaranteed." See New York Department of State, http://www.dos.ny.gov/corps/bus_entity_search.html(last visited February 14, 2022).

page Agreement[9] provided Carsky, Brownell, Berrigan & Shaheen, M.D., P.C. (the Employer) with three options "as respects policies issued by the Insurance Company to certain individuals." The Employer's options were: [1] "to make salary deductions for required premiums for such policies and to remit such premiums to the Insurance Company when due," or [2] "to pay a portion of the required premiums and to make salary deductions of the remainder . . . and remit such premiums to the Insurance Company when due", or [3] "to pay in full the required premiums . . . and remit such premiums to the Insurance Company." (Id.) There is a handwritten "X" placed next to the first option. (Id.) In consideration for the Employer's salary deductions and remitting, the Insurance Company agreed to accept reduced premiums for such policies. (Id.) The Agreement could be terminated by either party with thirty days written notice. (Id.)

The record does not establish: (1) Whether Carsky, Brownell, Berrigan & Shaheen, M.D., P.C. ever actually made a salary deduction and remitted it to Provident; (2) the identities of the "certain individuals" whose policies had issued and were eligible for such a premium reduction; (3) any factual or legal basis to find the Agreement would be binding on Prospect Hill; (4) whether

---

[9] For summary judgment purposes, the Court will accept that Defendants could establish the authenticity of the Salary Allotment Agreement.

Prospect Hill adopted or ratified this Salary Allotment Agreement; or (5) whether Prospect Hill ever made such deductions for anyone either prior to or after Dr. Allen's 1986 employment.  Indeed, the uncontradicted evidence is that Prospect Hill did not do anything in connection with this Agreement. As to Dr. Allen, he arrived at Prospect Hill ten years and two name-changes later.  Dr. Allen stated, without contradiction, that each partner at Prospect Hill was involved in managing all aspects of the practice, including any type of discounted benefits packages.  There was never any discussion of a salary allotment agreement or premium reduction plan concerning disability benefits. (Doc. #149-1, ¶ 27.)  Under the circumstances set forth in the record, an Agreement signed by a Prospect Hill predecessor entity fails to provide any support for the existence of an ERISA plan by Prospect Hill.  Even the existence of a Salary Allotment Agreement would itself be insufficient to establish an ERISA plan.[10] The Court finds that the

_____

[10] Defendants' management recognized in an internal memo from 1995 that "[s]alary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA." (Doc. #149-3, McCall Memo.) The memo further suggests that the company began modifying its salary allotment agreements in 1995 to include endorsement language in an effort to ensure ERISA applicability for new agreements going forward. (Id.) Compare Saunders v. Provident Life & Accident Ins. Co., No. 16-cv-1474-JLK, 2018 U.S. Dist. LEXIS 162340, at *19 (D. Colo. Mar. 1, 2018) (existence of a salary allotment agreement not evidence of the intent to provide benefits where plaintiff paid his own premiums); Crooms v. Provident Life & Accident Ins. Co., 484 F. Supp. 2d 1286, 1298 (N.D. Ga. 2007)(employer established a plan under ERISA where a salary allotment agreement named and identified the present

Salary Allotment Agreement signed by a Prospect Hill predecessor entity, even if binding on Prospect Hill, fails to provide any support to the argument that Prospect Hill established an ERISA plan to benefit Plaintiff (or anyone else).

    **(b)   Salary Allotment Rider**

Defendants also point out that each of Dr. Allen's Individual Policies has a Salary Allotment rider referencing a Salary Allotment Agreement. (Doc. #145, p. 18.)   The "Salary Allotment Premium Payment" provision (the rider) found in each of Dr. Allen's Individual Polices states in part that "[i]n consideration of the Salary Allotment Agreement between your employer and us, we agree to accept Policy Premiums as billed to your employer." (Doc. #87-1, p. 21.)   The rider also provides that "3. This rider will be void if: a. your employment with your employer ends; b. the Salary Allotment Agreement is terminated; or c. for any reason, your employer fails to pay premiums." (<u>Id.</u>)   Even assuming that the Salary Allotment Agreement referred to in the riders was the 1976 Agreement signed by Prospect Hill's predecessor, the record is clear that Prospect Hill did not ever pay or deduct Dr. Allen's

---

employer, the employer received semi-annual invoices for all the disability policies, the bookkeeper corresponded with the insurance company regarding the addition/subtraction of employees from the employer's insurance coverage, and the employer provided the premium payments to the insurer).

premiums for his Individual Polices.  Therefore, by its very language the rider is "void" and does not support an assertion that Prospect Hill has established an ERISA plan.

    **(c)**    **Billing Under Common Risk Number**

At various times other medical partners at Prospect Hill purchased individual disability insurance policies from Defendants through Agent Schultz.  It appears that Defendants assigned all such individual policies a common risk number (R-12429) for their internal paperwork. Defendants assert that the common risk number is evidence of group billing, which in turn establishes the existence of an ERISA plan created by Prospect Hill. (Doc. #145, p. 18.)

At least internally, Defendants referred to these various individual policies for Prospect Hill partners as a "group," using the name Prospect Hill Radiology as their designation of the group. At least two of the premium bills (Docs. ##147-19, 147-21) for the individual policies of these partners were addressed to "Prospect Hill Radiology" in care of Defendants' agent (David Schultz) at the agent's business address.  Agent Schultz then billed the individuals for payment of their respective premiums, including Dr. Allen, who was sent invoices and billed for his Individual Policies by Agent Schultz.  Dr. Allen provided copies of invoices for the Individual Policies which have his and/or his wife's handwriting noting "paid" and the date paid. See (Doc. #149-1, ¶¶

35-38, pp. 126-135.) According to Dr. Allen, he sent payment to Agent Schultz for the first two invoices, and for the remaining invoices he made the payment to Provident.  None of the payments involved Prospect Hill. (Id.; Doc. #149, pp. 27-28.)

The internal administrative use of a common internal risk number by an insurer does not establish that an ERISA plan has been created by an employer for its employees.  As discussed earlier, the focus of the inquiry is the conduct of the employer, not the conduct of the insurer. Donovan, 688 F.2d at 1373; Moorman v. UnumProvident Corp., 464 F.3d at 1269; Anderson, 369 F.3d at 1263; Butero, 174 F.3d at 1214.  Prospect Hill had no involvement in either the purchase of the Individual Policies by Dr. Allen or the internal administrative procedures and paperwork utilized by Defendants with respect to these Individual Policies.  Prospect Hill's bookkeeper confirmed that Prospect Hill knew nothing about Plaintiff's Individual policies, that Prospect Hill did not pay or deduct the premiums, and that Prospect Hill was not participating in group billing. (Doc. #149-1, p. 136.)

The Court finds that the existence of a common "risk number" assigned by Defendants, and their single billing format to their agent for multiple individual policies, are insufficient to establish that Prospect Hill established an ERISA plan. See Rosen v. Provident Life & Accident Ins. Co., No. 2:14-cv-0922-WMA, 2015 WL 260839, 2015 U.S. Dist. LEXIS 6586, at *24 (N.D. Ala. Jan. 21,

2015) (holding that a common risk group number and salary allotment agreement were insufficient to warrant ERISA preemption).

### (d)   Discounted Premiums

Finally, Defendants argue that Prospect Hill established an ERISA plan by enabling Dr. Allen to receive a 10% discounted premium based on the Salary Allotment Agreement. (Doc. #145, p. 19.) According to Defendants, "[p]ursuant to the express terms of the Salary Allotment Agreement, Provident accepted premiums on a 'reduced basis' in consideration for Prospect Hill's assistance in facilitating the collection and remittance of premiums from employees to whom policies were issued." (Id.) Defendants contend that the discounted purchase of long-term disability insurance is sufficient to demonstrate that Prospect Hill intended to confer a benefit to its employees and created an ERISA plan. (Id.)

The parties dispute whether Dr. Allen actually received a discount on his premiums for the Individual Policies.  For summary judgment purposes only, the Court resolves this conflict in favor of Defendants, and assumes that Dr. Allen's premiums were the subject of a ten-percent discount.  This alone, however, is insufficient to establish an ERISA plan.  There is no evidence Salary Allotment Agreement is binding on Prospect Hill, and the evidence clearly establishes that Prospect Hill was not billed for or remit premiums on Dr. Allen's Individual Policies.  The existence of a discount for premiums does not establish an ERISA

plan under the record evidence in this case.  Defendants' reliance on Harding v. Provident Life & Accident Ins. Co., 809 F. Supp. 2d 403, 408 (W.D. Pa. 2011) and Alexander v. Provident Life and Acc. Ins. Co., 663 F. Supp.2d 627 (E.D. Tenn. 2009) is misplaced, since both of those cases materially different facts in which the discount was in exchange for the employer deducting and remitting the employee's premiums.

In sum, the Court finds that the undisputed material facts establish that the Individual Policies were not established and maintained by Prospect Hill.  As such, Dr. Allen's Individual Policies do not qualify as ERISA plans, and the state law breach of contract claim in Count 1 is not preempted by ERISA.

C. **Application of Defensive Preemption Principles to Group Policy**

Defendants argue that Dr. Allen's Group Policy is part of an ERISA-governed benefit plan and therefore the state law claim in Count 2 is preempted by ERISA.  (Doc. #145, p. 22.) Plaintiff responds that the Group Policy falls within the safe harbor provision of ERSIA, and in any event is not within the scope of ERISA and is therefore not preempted. (Doc. #149, pp. 6-14.)

As noted in the Court's discussion of Count 1, the parties dispute whether the Court should apply the federal common law as interpreted by the Second Circuit or the federal common law as interpreted by the Eleventh Circuit.  The Group Policy states that the "governing jurisdiction" is New York, and that the Group Policy

"is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments." (Doc. #87-5, p. 3).

It is clear that "claims involving the interpretation and enforcement of employee benefit plans are brought under federal common law." Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1333 (11th Cir. 1995). There does not appear to be an actual conflict between the Second Circuit and the Eleventh Circuit as to defensive preemption and the safe harbor ERISA law. See Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 152 (2d Cir. 1994), citing Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982).

**(1)  Safe Harbor Exemption**

Courts have suggested that the safe harbor analysis proceed first since even an employee welfare benefit plan under ERISA may fall outside ERISA's reach if it comes under the "safe harbor" exemption. See Moorman, 464 F.3d at 1267.

The Code of Federal Regulations establishes a regulatory safe harbor which excepts from the definition of "employee welfare benefit plan" certain "group or group-type insurance program[s]" "offered by an insurer to employees." 29 C.F.R. § 2510.3-1(j). To qualify for the exemption, the following four requirements must all be satisfied:

> (1) No contributions are made by an employer or employee organization;

> > (2) Participation [in] the program is
> > completely voluntary for employees or
> > members;
> >
> > (3) The sole functions of the employer or
> > employee organization with respect to the
> > program are, without endorsing the program,
> > to permit the insurer to publicize the
> > program to employees or members, to collect
> > premiums through payroll deductions or dues
> > checkoffs and to remit them to the insurer;
> > and
> >
> > (4) The employer or employee organization
> > receives no consideration in the form of
> > cash or otherwise in connection with the
> > program, other than reasonable
> > compensation, excluding any profit, for
> > administrative services actually rendered
> > in connection with payroll deductions or
> > dues checkoffs."

29 C.F.R. § 2510.3-1(j). All four regulatory requirements must be satisfied in order for an insurance plan to qualify for the safe harbor exemption. Butero, 174 F.3d at 1207; Grimo, 34 F.3d at 152; Stern v. Provident Life & Accident Ins. Co., 295 F. Supp. 2d 1321, 1325 (M.D. Fla. 2003). If "an insurance plan meets all four criteria of the safe harbor provision, the Court's inquiry concludes, and ERISA is conclusively deemed not to preempt a plaintiff's state law claims." Riggs v. Smith, 953 F. Supp. 389, 394 (S.D. Fla. 1997).

Only the third element is at issue in this case, since the record establishes that the other requirements have been satisfied. Defendants argue that the safe harbor exemption is unavailable because Prospect Hill "endorsed" Dr. Allen's Group

Policy by purchasing it and serving as the named Plan
Administrator. (Doc. #145, pp. 23-24.) Plaintiff responds that
Prospect Hill did not endorse the Policy because "the partners did
not perform any functions concerning the Group Policy except to
make premium payments." (Doc. #155, p. 23.)  The Court finds that
the undisputed facts establish that Prospect Hill endorsed the
Group Policy, and therefore the Group Policy does not fall within
the safe harbor provision.

An employer endorses a program if it "urges or encourages
member participation in the program or engages in activities that
would lead a member reasonably to conclude that the program is
part of a benefit arrangement established or maintained by the
employee organization." Moorman, 464 F.3d at 1268 (citing ERISA
Op. Letter No. 94-26A, 1994 ERISA LEXIS 28, 1994 WL 369282 (July
11, 1994)); see also Johnson v. Watts Regulator Co., 63 F.3d 1129,
1135 (1st Cir. 1995) (holding that standard is whether "an
objectively reasonable employee would conclude on the basis of the
employer's actions that the employer had not merely facilitated
the program's availability but had exercised control over it or
made it appear to be part and parcel of the company's own benefit
package"). Thus, "the relevant framework for determining if
endorsement exists is to examine the employer's involvement in the
creation or administration of the policy from the employees' point
of view." Hamilton v. Provident Life & Accident Ins. Co., No. 1:07-

cv-302, 2008 U.S. Dist. LEXIS 44687, at *10 (E.D. Tenn. June 3, 2008). To remain neutral for purposes of the safe harbor regulation, an employer like Prospect Hill must "refrain from *any* function other than permitting the insurer to publicize the program and collect[] premiums." Butero, 174 F.3d at 1213.

Dr. Allen's Group Policy is a contract between the Policyholder "Prospect Hill Radiology Group, P.C." and First Unum Life Insurance Company which restricted eligibility to the "Partners of Prospect Hill Radiology in active employment in the United States with the Employer." (Doc. #87-5, pp. 2, 5.) The Group Policy gave Prospect Hill the right, in its sole and absolute discretion, to amend, modify, or terminate the plan, in whole or in part, and for any reason, which could only be approved by Unum. The Group Policy also instructed the insured to contact the Plan Administrator (i.e., Prospect Hill) if they had questions about the plan. (Doc. #87-5, pp. 3, 11, 36, 40.) The Group Policy has an "Additional Summary Plan Description Information" that states "if" the Policy provides benefits under a Plan that is subject to ERISA, Prospect Hill is the plan administrator and agent for service of legal process. (Doc. #87-5, p. 35.)

The Court finds that an objectively reasonable partner would conclude that Prospect Hill had endorsed the Group Policy by exercising control over it that went beyond simply permitting the

insurer the publicize the program and collect premiums.  The safe harbor exemption therefore does not apply to Count 2.

### (2)   Employee Benefit Plan Governed By ERISA

Failure to establish a safe harbor is not the end of the inquiry for Dr. Allen.  "Even if the safe harbor is barred, 'that does not necessarily mean that the insurance policy is part of an ERISA plan.' Butero, 174 F.3d at 1214; see also Anderson, 369 F.3d at 1263 n. 2 ("[A] plan that falls outside of the safe harbor exception does not necessarily fall within the jurisdiction of ERISA."). Moorman, 464 F.3d at 1269.  Thus, Defendants must still establish that the Group Policy satisfies the ERISA[11] requirements.

### (a)   State Law Claim "Relates To" an ERISA Plan

The Court must determine whether Dr. Allen's state law claim in Count 2 "relates to" his Group Policy in order for the claim to be defensively preempted by ERISA. 29 U.S.C. § 1144(a). See supra pp. 9-10.  For the same reasons as discussed in connection with Count 1, the Court finds that Plaintiff's breach of contract claim in Count 2 "relates to" a ERISA plan.  See supra pp. 12-13.

---

[11] For the Group Policy to be an ERISA plan, it must be "(1) part of a plan, fund or program, (2) [that has been] established or maintained (3) by an employer . . .  (4) for the purpose of providing . . . disability benefits (5) to participants or their beneficiaries." Garcon, 779 F. App'x at 597.

**(b)   Part of a Plan, Fund or Program**

Dr. Allen concedes that Prospect Hill entered into a contract with defendant First Unum Life Insurance Company for group long term disability benefits (Doc. 149-1, p. 16) and that the Group Policy details the intended benefits. (Doc. #87-5, pp. 5-6, 17-25.) A reasonable person can ascertain that: (1) the intended benefits are the monetary disability payments that Dr. Allen was to receive pursuant to the Group Policy in the event he could no longer perform his job as a diagnostic radiologist (Doc. #87-5, pp. 5-6); (2) the intended beneficiaries are "partners of Prospect Hill Radiology," which in this case would include Dr. Allen (Id., p. 5); (3) the financing was to come from the employee, since the Group Policy stated that "You pay the cost of your coverage,"[12] while it was responsibility of the policyholder (Prospect Hill) to deduct and remit premium payments to the insurer (Id., pp. 5, 10); and (4) receiving benefits was to be accomplished by following the procedures set forth in the Group Policy. (Id., p. 8.)

**(c)   Establishment or Maintenance of the Plan By Prospect Hill**

Prospect Hill established a fund to pay benefits by applying for and selecting the Unum plan as its long-term disability plan. The Group Policy was limited to the "partners" in active

---

[12] The group Policy defines "you" as "an employee who is eligible for Unum coverage." (Doc. #87-5, p. 34.)

employment, working at least 30 hours per week (Doc. #87-5, pp. 3, 5), thus making the Unum plan a benefit closely tied to the employer-employee relationship. See, e.g., Moorman, 464 F.3d at 1270 (employer established a fund to pay benefits by selecting a sole long-term benefits plan and limiting eligibility to certain employees); Anderson, 369 F.3d at 1265 (employer established a fund to pay benefits by selecting the plan and limiting eligibility to certain employees); Searles v. First Fortis Life Ins. Co., 98 F. Supp. 2d 456, 460 (S.D.N.Y. 2000) (ERISA plan established by the employer where, among other actions, purchased a group policy and chose the eligibility requirements for participation).

Prospect Hill is directly involved in the benefit payment process. The Group Policy states that Prospect Hill would provide claim forms to employees who wanted to make a claim, and that Prospect Hill had to complete its portion of the claim form for an employee to initiate a claim for benefits.  Prospect Hill would thus assist its employees to actually receive the disability benefits. (Doc. #87-5, p. 8.) See Moorman, 464 F.3d at 1270 (where employer did not actually pay benefits, its direct involvement in the payment process (i.e., maintaining a supply of claim forms and facilitating the payment of benefits) satisfied the fourth Butero factor); Anderson, 369 F.3d at 1266 (employer was directly involved in the payment of benefits by filling out a section of the claim form, verifying eligible employees, and sending the form to the

insurer which demonstrated, in part, that the employer established a plan).

The Court finds that an objectively reasonable partner would conclude that Prospect Hill had established a plan since Prospect Hill entered into a contract with First Unum for the sole purpose of providing long term disability benefits, was named as the Plan administrator, and had the sole power to change, amend or terminate the plan. Prospect Hill clearly intended to provide a benefits plan. "[T]he policy itself expresses [the employer's] intent to provide benefits on a regular and long-term basis," Anderson, 369, F.3d at 1266 (quotations omitted). Prospect Hill had continuing obligations under the plan, and for the plan to remain viable, Prospect Hill had to remit all premiums to First Unum, inform the insurer as to each employee's eligibility or lack thereof, and complete portions of the claim forms. (Doc. #87-5, pp. 10, 36.)

The Group Policy between Prospect Hill and First Unum, as well as the certificate of coverage that was in place at the time of Dr. Allen's disability, provide that the Policy "is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security of 1974 (ERISA) and any amendments." (Doc. #87-5, pp. 3, 13.) Plaintiff argues that this qualifying language squarely draws into question ERISA applicability (Doc. #155, p. 21), while Defendants argue it is indicative of ERISA preemption. (Doc. #145, p. 23.) The policy

in Anderson contained the exact same language, from which the Eleventh Circuit concluded "clearly state that ERISA governed the policy." Anderson, 369 F.3d at 1261, 1266. Accordingly, the Court finds that Defendants have established that Prospect Hill "established" and "maintained" a plan.

### (d) Purpose of Providing Specific Types of Benefits

A plan is an ERISA plan only to the extent that it is maintained for the purpose of providing the types of benefits that Congress decided to protect when enacting ERISA. See Kemp v. IBM, 109 F.3d 708, 713 (11th Cir. 1997). The evidence shows, and the parties agree, that Dr. Allen's Group Policy concerned disability benefits in the event he could no longer perform his job as a diagnostic radiologist. (Doc. #87-5; Doc. #145, ¶ 16; Doc. #149-1, ¶ 58.) Consequently, the Court finds the undisputed facts demonstrate that disability benefits provided by Dr. Allen's Group Policy are the type of benefits protected by ERISA.

### (e)  To Participants or Their Beneficiaries

To qualify as an ERISA plan, the plan "must provide benefits to at least one employee." 29 C.F.R. § 2510.3-3(b). ERISA defines "participant" as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . or whose beneficiaries may become eligible to receive any such benefit." 29 U.S.C. § 1002(7). Dr. Allen asserts

that the Group Policy does not fall under ERISA's domain because the Group Policy states it applies to the "Partners of Prospect Hill Radiology."  This demonstrates, Dr. Allen argues, that he is in fact a partner of Prospect Hill, not an employee. (Doc. #87-5, p. 5; Doc. #145, p. 8.)

Defendants argue that Plaintiff is an "employee" for ERISA purposes because Prospect Hill Radiology Group, P.C. is a professional corporation, meaning it has shareholders, not partners.  (Doc. #145, pp. 17-18.)  Defendants contend that while partners who wholly own a business are not normally "employees" of that business for ERISA purposes, the same is not true of multiple shareholders who wholly own a corporation. (Id., citing Provident Life and Acc. Ins. Co. v. Sharpless, 364 F.3d 634, 639 (5th Cir. 2004)(holding that shareholders in a multiple-shareholder corporation are employees under ERISA)).

As discussed in connection with the Individual Policies, the Court is not persuaded by Plaintiff's argument.  The Group Policy refers to those covered "partners" as "employees," who arguably would be within the reach of ERISA (Doc. #87-5, p. 5), and Plaintiff presents no evidence to show Prospect Hill is a legal partnership.  Dr. Allen avers in his declaration that on January 1, 1989, he became a "shareholder of Prospect Hill" and "received 25 shares in the corporation." (Doc. #149-1, ¶ 13.) Dr. Allen's declaration also comports with New York State records which

34

demonstrate that Prospect Hill is designated as a professional corporation (Doc. #147-17, pp. 2-3), not a partnership, and as such, has shareholders, not literally partners. See Sharpless, 364 F.3d at 639. The undisputed evidence thus shows that Plaintiff is a shareholder of Prospect Hill.

Plaintiff also argues that he is not a "participant" or "employee" under ERISA because he is a "working owner" of Prospect Hill. (Doc. #149, p. 8; Doc. #155, p. 19.) In Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 21 (2004), the Court explained that "ERISA's text contains multiple indications that Congress intended working owners to qualify as plan participants." Id. The Yates Court further explained that "a working owner may have dual status, i.e., he can be an employee entitled to participate in a plan and, at the same time, the employer . . . who established the plan." Yates, 541 U.S. at 15.

It is undisputed that Prospect Hill is a professional corporation in which Dr. Allen is a shareholder, along with five other physicians identified by Dr. Allen as shareholders. (Docs. ##69-2; 69-3; 69-4; 69-6; 149-1, ¶ 44.) While these physicians are shareholders of Prospect Hill, 29 C.F.R. § 2510.3-3(c)(1) does not exclude shareholders from the ERISA definition of "employee." Under ERISA, a plan covering only corporate shareholders, as the Group Policy, is exempt from ERISA only if the *sole* shareholder wholly owns the company and coverage is limited to the *sole*

shareholder and a spouse, while plans that cover working owners and their non-owner employees are within ERISA's reach. See Yates, 541 U.S. at 21. Indeed, in Advisory Opinion 76-67, the U.S. Department of Labor explained that a plan covering only corporate shareholders was exempt from ERISA only if the company was *wholly owned* by *one* shareholder or by the shareholder and his or her spouse. See DOL Advisory Opinion 76-67, 1976 ERISA Lexis 58 (May 21, 1976)(emphasis added).

Although Dr. Allen argues the DOL advisory opinion is not applicable, the Court disagrees. See, e.g., Sharpless, 364 F.3d at 639;[13] Silverman, 2015 U.S. Dist. LEXIS 99714, at *8; Sullivan v. Paul Revere Life Ins. Co., No. 5:09-cv-1015-JEO, 2010 U.S. Dist.

---

[13] Plaintiff argues that the Fifth Circuit in Sharpless totally misconstrued the holding by the Supreme Court in Yates, 541 U.S. at 6, by blanketly ruling that "shareholders in a multiple-shareholder corporation . . . are employees under ERISA." Sharpless, 364 F. 3d 369. (Doc. #149, p. 11 n.7.) Plaintiff asserts the Fifth Circuit omitted the critical factor that in order for shareholders to be deemed employees under a group plan, the plan must also cover a non-shareholder employee. (Id.) Defendants' respond that Plaintiff has misapprehended Yates in that unlike Sharpless and the present case, Yates considered whether a "sole shareholder" of a professional corporation was an employee for ERISA purposes. (Doc. #153, p. 5.) The Court agrees. The Yates court held that while Congress "intended working owners to qualify as plan participants," plans covering "sole owners or partners and their spouses . . . fall outside [ERISA's] domain." Yates, 541 U.S. 16, 21. Sharpless not only properly considered Yates, but it also followed the DOL's advisory opinion which clearly stated that a plan covering corporate shareholders is "exempt from ERISA only if the company [is] wholly owned by one shareholder." Id. at 638-39 (citing DOL Advisory Opinion 76-67, 1976 ERISA LEXIS 58 (May 21, 1976)).

LEXIS 144444, at *28 (N.D. Ala. May 28, 2010); Pope v. Wash. Nat'l Ins. Co., No. 4:05-cv-01412-HGD, 2005 U.S. Dist. LEXIS 58090, at *11-12 (N.D. Ala. Dec. 15, 2005).

Drawing all reasonable inferences in favor of Plaintiff, the Court concludes that "shareholders in a multiple-shareholder corporation, such as [Dr. Allen], are employees under ERISA." Sharpless, 364 F.3d at 639. Accordingly, Plaintiff's Group Policy is part of an ERISA plan that was established and maintained by Prospect Hill for the purpose of providing disability benefits to its employee Dr. Allen. See Garcon, 779 F. App'x at 597.

In sum, the Court finds that Defendants have established that the breach of contract claim for violation of the Group Policy is defensively preempted by ERISA.

## V.

Both sides seek summary judgment on the merits of both Counts 1 and 2. Dr. Allen argues that he is entitled to judgment on the breach of contract claim in Count 1, while Defendants argue they are entitled to judgment on the ERISA-preempted claim in Count 2. The Court finds that neither party is correct.

### A. Breach of Contract – Count 1

Dr. Allen asserts that because there is an absence of evidence that he is not disabled, he therefore is entitled to summary judgment that Defendants breached the Policies' terms when they terminated his disability benefits. (Doc. #148, p. 2.) But the

record contains a host of disputed issues of material facts which preclude granting summary judgment as to the Individual Policies.

**(1)  Choice Of Law**

As a threshold matter, Dr. Allen asserts that (mostly) New York law governs his breach of contract claim as to the Individual Policies since they were executed in New York.  For purposes of this Motion, Defendants do not disagree. (Doc. #154, p. 2.)

This case was filed in federal court on the basis of diversity jurisdiction. (Doc. #87, pp. 1-2.)  "[A] federal court sitting in diversity appl[ies] the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary." Salve Regina College v. Russell, 499 U.S. 225, 226 (1991).  There is no federal statutory or constitution directive to the contrary applicable to this case, so the Court determines the applicable substantive state law using the choice-of-law rules of the forum state.  Travelers Prop. Cas. Co. of Am. v. Moore, 763 F.3d 1265, 1270 (11th Cir. 2014).  Therefore, the Court looks to Florida's choice-of-law rules to determine which state's substantive law will apply.  Frank Briscoe Co. v. Ga. Sprinkler Co., 713 F.2d 1500, 1503 (11th Cir. 1983).

In the absence of a contractual provision specifying the governing law or a public policy exception, "Florida follows the 'lex loci contractus' choice-of-law rule, which provides that the law of the jurisdiction where the contract was executed governs

the rights and liabilities of the parties in determining an issue
of insurance coverage." Rando v. Gov't Emps. Ins. Co., 556 F.3d
1173, 1176 (11th Cir. 2009) (quoting State Farm Mut. Auto. Ins.
Co. v. Roach, 945 So. 2d 1160, 1163 (Fla. 2006)(internal quotations
omitted)).   See also Am. United Life Ins. Co. v. Martinez, 480
F.3d 1043, 1059 (11th Cir. 2007)("Absent a specific contractual
provision to the contrary, Florida conflict of law rules dictate
that courts should apply *lex loci contractus*, or the law of the
state where the contract was made, to questions of contracts (other
than those that deal with contracts for the performance of
services).");  Shaps v. Provident Life & Accident Ins. Co., 244
F.3d 876, 881 (11th Cir. 2001) (same). "*Lex loci contractus* is, in
general, an 'inflexible,' bright-line rule that exists 'to ensure
stability in contract arrangements.'" Rando, 556 F.3d at 1176
(quoting Roach, 945 So. 2d at 1164).   There is one general
exception to the *lex loci contractus* doctrine: a Florida court
will depart from the doctrine "for the purpose of necessary
protection of [Florida] citizens [and to enforce] some paramount
rule of public policy." U.S. Fid. & Guar. Co. v. Liberty Surplus
Ins. Corp., 550 F.3d 1031, 1033 (11th Cir. 2008)(quoting Roach,
945 So. 2d at 1164.)

The Individual Policies do not contain a choice of law
provision, the contracts are not for the performance of services,
and there is not a paramount public policy that warrants departure

from the *lex loci contractus* doctrine in this case.  The undisputed evidence demonstrates that Dr. Allen applied for and executed the Individual Policies while residing in New York and they were delivered to him in New York. (Doc. #43-1, ¶¶ 4, 10, 15.) Thus, under the Florida *lex loci contractus* rule, the substantive law of New York applies to the Individual Policies. See Shaps, 244 F.3d at 881 (under *lex loci contractus*, New York substantive law applied to interpretation and application of a disability insurance contract executed in New York when a breach of contract claim was filed in Florida.)

Under New York substantive law, a plaintiff must establish four elements to sustain a breach of contract claim by a preponderance of the evidence: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Leeber Realty LLC v. Trustco Bank, 316 F. Supp. 3d 594, 609 (S.D.N.Y. 2018).  Dr. Allen correctly maintains that the disputes in this action focus on the elements of "performance of Plaintiff" and "breach of contract by Defendant" elements of the cause of action.  (Doc. #148, p. 15.)

Dr. Allen argues, however, that one aspect of Florida law still governs the breach of contract claim.  He states that under Florida law where the insurer seeks to avoid the continued payment of benefits to the insured, "the burden is on the insurer to establish by the preponderance of the evidence that the condition

of the insured is such that he no longer comes within the purview
of the policy in this regard." (Doc. #148, pp. 15-16, citing <u>Mut.
Life Ins. Co. of N.Y. v. Ewing</u>, 10 So. 2d 316, 318 (Fla. 1942)).
The Florida Supreme Court stated in <u>Ewing</u>:

> If and when an insured makes his initial claim
> for indemnity under a policy such as these,
> the burden of proof is on the insured to show
> that he comes within the purview of the terms
> of the policy; that he is totally and
> permanently disabled. If he has been entitled
> to the benefits of the policy and receives
> such and thereafter, while receiving such
> benefits, so recovers as to no longer be
> entitled to the benefits and thereafter, for
> any reason, shall again become entitled to the
> benefits, the burden is again on him to
> establish that second or subsequent
> disability, exists the same as it was to
> establish the first. The rule as to such cases
> is too well settled to require citation of
> authorities.
>
> Where, however, it is established, as in this
> case, that a permanent and total disability
> existed within the purview of the policy and
> the insurer seeks relief from continuation of
> payment of indemnities theretofore paid under
> and within the purview of the policy the
> burden is on the insurer to establish by the
> preponderance of the evidence that the
> condition of the insured is such that he no
> longer comes within the purview of the policy
> in this regard.

<u>Ewing</u>, 10 So. 2d at 317-18 (citations omitted).

Dr. Allen asserts that the burden-shifting is a procedural
issue to which Florida law applies. <u>Shaps v. Provident Life &
Accident Ins. Co.</u>, 826 So. 2d 250, 254-55 (Fla. 2002)("in Florida
the burden of proof is a procedural issue for conflict-of-laws

purposes," not a matter of substantive law.)  Dr. Allen therefore argues that Defendants must demonstrate, by a greater weight of the evidence[14], that Dr. Allen no longer has floaters and that his disability has ceased. (Doc. #148, p. 16.)

Dr. Allen is correct that under Florida law the burden of proof is a procedural issue.  Shaps, 826 So. 2d at 254-55.  Thus, "where the insurer begins to pay total disability benefits to an insured but later ceases to pay benefits based on a belief that the insured is not disabled, . . . the insurer [has] to establish by the preponderance of the evidence that the condition of the insured is such that he no longer comes within the purview of the policy in this regard." Shaps v. Provident Life & Accident Ins. Co., 317 F.3d 1326, 1330 (11th Cir. 2003)(citing Fruchter v. Aetna Life Ins. Co., 266 So. 2d 61 (Fla. 3d Dist. Ct. App. 1972), cert. discharged, 283 So. 2d 36 (Fla. 1973)(quotations omitted)). Therefore, Defendants have the burden of establishing that Dr. Allen's visual condition is no longer disabling within the meaning

---

[14] The Florida greater weight of the evidence standard is equivalent to the preponderance standard.  Hall v. State, 212 So. 3d 1001, 1037 n.12 (Fla. 2017) (stating that "our case law has stated this burden in terms of the greater weight of the evidence or in terms of a preponderance of the evidence which are synonymous."). There does not appear to be any conflict between Florida, New York, or federal law regarding the burden of proof – in the context of this case, all three use a preponderance of the evidence.

of the Individual Policies.  This does not appear to be disputed. (Doc. #179, p. 19, §10B.)

Dr. Allen is incorrect in arguing that the presence of floaters alone constitutes a disability. Defendants argue that the central question is not whether Dr. Allen did or did not experience floaters at the time benefits were terminated, but rather whether the floaters then rendered him incapable of working as a radiologist. Defendants assert such a determination is factual issue that is very much in dispute, thus precluding summary judgment. (Doc. #154, p. 4.)  As discussed below, the Court agrees.

**(2)  Conflicting Evidence**

The Court finds that there are numerous genuine issues of material facts which preclude summary judgment as to the Individual Policies.  In particular, the medical opinion evidence of record is in conflict as to the severity of Dr. Allen's condition, whether Plaintiff's condition prevented him from performing the substantial or material duties of a diagnostic radiologist, and whether Dr. Allen failed to take reasonable steps to mitigate the severity of his condition. (Doc. #148-2, p. 331; Doc. #148-4, pp. 203, 206, 220-23; Doc. #148-5, pp. 161-63, 461, 463-66, 491); see, e.g., Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 79 (2d Cir. 2002) (quoting Hudson Riverkeeper Fund v. Atlantic Richfield Co., 138 F. Supp. 2d 482, 488 (S.D.N.Y. 2001))("Where, as here, there are conflicting expert reports presented, courts

43

are wary of granting summary judgment."); <u>Redd v. N.Y. State Div.
of Parole</u>, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility
determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those
of a judge." The court's role in deciding a motion for summary
judgment 'is to identify factual issues, not to resolve them.'")
(internal citations and quotations omitted). Accordingly, whether
Plaintiff is totally disabled according to the terms of his
Individual Policies can only be characterized as a question of
fact which is properly considered by a jury. See <u>Hippe v. Life
Ins. Co. of N. Am.</u>, No. 02-CV-0086 (ILG), 2003 U.S. Dist. LEXIS
27374, at *19 (E.D.N.Y. July 31, 2003); <u>see also</u> <u>Stewart v. Penn
Mut. Life Ins. Co.</u>, 97 Civ. 5779 (AKH), 1999 U.S. Dist. LEXIS
20025, at *4 (S.D.N.Y. Dec. 29, 1999)("Under New York law, the law
governing this agreement, it is generally a question for the jury
to determine whether a policy holder is totally disabled within
the meaning of the policy provision . . . .") (internal quotations
omitted).

### B. ERISA Claim – Count 2

Defendants argue that they are entitled to summary judgment
as to Count 2 because the administrative record provides reasonable
grounds for the termination of Dr. Allen's disability benefits
under his Group Policy, and therefore was not arbitrary or
capricious. (Doc. #145, p. 2; Doc. #159, p. 7.)  The Court finds

that it would be premature to consider a summary judgment on the ERISA-governed count.

While Count 2 will be dismissed without prejudice as defensively preempted by ERISA, Dr. Allen will be granted leave to file an amended complaint in which he states his claim(s) as violations of ERISA. Since such a claim is determined on a review of the administrative record, the Court will bifurcate the ERISA claim (Count 2) from the state-law breach of contract claim (Count 1). Defendants will be required to submit an administrative record, subject to any challenges as may be appropriate.[15] The Court will enter a separate scheduling order as to the ERISA claim(s). Accordingly, Defendants' motion for summary judgment as to Count 2 is denied. Defendants' Motion for Summary Judgment is also denied to the extent it asserts that Count 1 is preempted by ERISA.

## VI.

Lastly, Plaintiff moves for summary judgment on Defendants' First, Fourth and Fifth Affirmative Defenses. (Doc. #105, pp. 25-

---

[15] ERISA claims for benefits are to be decided after consideration of a full administrative record. See Williamson v. Travelport, LP, 953 F.3d 1278, 1289 (11th Cir. 2020); Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008). A plan administrator "has the obligation to identify the evidence in the administrative record" and a claimant must have "a reasonable opportunity to contest whether that record is complete." Williamson, 953 F.3d at 1289 (citation omitted); Melech v. Life Ins. Co. of N. Am., 739 F.3d 663 (11th Cir. 2014).

28.) Plaintiff's Motion for Summary Judgment on Defendants' First, Fourth and Fifth Affirmative Defenses (Doc. #149) is: (1) granted as to the portion of the First Affirmative Defense which asserts that Count 1 is preempted by ERISA; (2) granted as to the portion of the Fourth Affirmative Defense which asserts that Dr. Allen failed to exhaust available ERISA administrative remedies as to Count 1; and (3) granted as to the portion of the Fifth Affirmative Defense which asserts that Count 1 of the SAC fails to state a claim upon which relief may be granted.  The motion is otherwise denied.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion for Summary Judgment on Counts 1 and 2 of the Second Amended Complaint (Doc. #145) is **GRANTED in part and DENIED in part.**

   a. Defendants' Motion for Summary Judgment as to Count 1 is **DENIED** as it is not preempted by ERISA.

   b. Defendants' Motion for Summary Judgment as to Count 2 is **GRANTED** as it is preempted by ERISA.

   c. Count 2 of the Second Amended Complaint is **dismissed without prejudice.**

2. Plaintiff's Motion for Summary Judgment as to Counts 1 and 2 of the Second Amended Complaint (Doc. #148) is **DENIED.**

3. Plaintiff's Motion for Summary Judgment on Defendants' First, Fourth, and Fifth Affirmative Defenses (Doc. #149) is **GRANTED in part and DENIED in part.**

   a. Plaintiff's Motion for Summary Judgment on Defendants' First Affirmative Defense as to Count 1 is **GRANTED**, but is otherwise **DENIED** as to this defense.

   b. Plaintiff's Motion for Summary Judgment on Defendants' Fourth Affirmative Defense as to Count 1 is **GRANTED**, but is otherwise **DENIED** as to this defense.

   c. Plaintiff's Motion for Summary Judgment on Defendants' Fifth Affirmative Defense as to Count 1 is **GRANTED**, but is otherwise **DENIED** as to this defense.

4. Plaintiff may file a Third Amended Complaint within **FOURTEEN (14) DAYS** of this Opinion and Order in which he states only his Group Policy claim as violation(s) of ERISA.

5. The Court bifurcates the proceedings on Count 1 of the SAC and any Third Amended Complaint filed. The Court will issue a separate Case Management and Scheduling Order as to Third Amended Complaint, if filed. The Court will also issue a separate Order as to the forthcoming jury trial in regard to Count 1 of the SAC.

**DONE AND ORDERED** at Fort Myers, Florida, this ___17th___ day of February, 2022.


_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of record